### BAKER et al. v. PATTERSON.

### No. 12627.

Court of Civil Appeals of Texas. Fort Worth.

Feb. 13, 1932.

Rehearing Denied March 19, 1932.

Kilgore & Rogers, of Wichita Falls, for plaintiffs in error.

Kenley & Kenley, of Wichita Falls, and R. O. Kenley, of Corpus Christi, for defendant in error.

CONNER, C. J.

The plaintiff, George Patterson, instituted this suit to recover a brokerage commission alleged to have accrued by reason of defendants' sale of a royalty interest in certain property in Jack county to the Lawson Petroleum Company, of Tulsa, Okl. Plaintiff alleged (1) a listing with plaintiff by defendants under contract to pay 10 per cent. commission; (2) a quantum meruit of 10 per cent. on the sale price; and (3) an express contract by defendants to pay $625 for plaintiff's furnishing a purchaser.

The defendants answered by a general demurrer and a general denial. By supplemental petition plaintiff alleged that the defendants, who by telegram had withdrawn the property from the listing with plaintiff, had done so for the purpose of defeating plaintiff's participation in the commission.

The case was tried before a jury upon three special issues, to which the jury answered that (1) plaintiff was the efficient and procuring cause of the sale; (2) that 5 per cent. was the customary commission in such cases; and (3) that plaintiff would have consummated the sale but for defendants' sending the telegram withdrawing the property from sale.

Upon the verdict so returned, the court rendered judgment in favor of plaintiff for $500 and costs, and the case is now before us for determination upon a writ of error duly prosecuted by the defendants.

The evidence is largely undisputed. It is to the effect that the defendants below owned a royalty interest in a described tract of land in Jack county, Tex.; that they were desirous of selling the same, having fixed a price of $10,000 therefor; that the plaintiff Patterson was a broker living in Bryson, Jack county, and as such began his efforts to sell the royalty involved, communicating with E. C. and E. B. Lawson, doing business under the name of the Lawson Petroleum Company, at Tulsa, Okl.; that his efforts to so interest the Lawsons in the property began about the middle of August, 1929, and so continued until about the first or second week in September, when he received a telegram from the defendants that the interest had been taken off the market; that from August 17, 1929, to the date of the telegram mentioned, the Lawsons kept in close touch with Patterson and finally concluded that they would buy the interest on

the terms Patterson had submitted, and with this purpose left for Wichita Falls; they arrived at Wichita Falls on September 9th. E. C. Lawson called Patterson up on the telephone at Bryson, in Jack county, and Patterson informed him that the royalty had been taken off the market; that thereupon Lawson heard through another broker of the royalty involved, and with him went to Mr. Baker, one of the owners of the royalty interest, and the sale was concluded on September 13, 1929, on the terms that had been offered by Patterson.

Plaintiffs in error insist that the court erred in refusing to give a peremptory instruction in their favor, and that the court should now and here reverse the judgment below and render judgment for them. This contention is based upon evidence of the defendants below to the effect that they had not listed the property in question with the broker for sale. Mr. Baker and Mr. Medders, the owners of the royalty, both testified that the property had not been listed with Mr. Patterson for sale. Patterson, however, testified to the contrary. Mr. Baker testified that he knew Patterson was at work on the sale, knew that he was a broker, knew that he lived at Bryson, near where the property was located, and knew that he was a realtor selling oil properties of all kinds. Baker was then asked:

"Q. Did you ever have a talk with him about what you would pay him if he found you a purchaser? A. I did not personally. If you will permit me, I will explain what I knew about it. I was away in California, and at the time I was away for some considerable time—I think during my absence Mr. Patterson called, knowing that we had that royalty, and talked to my bookkeeper, Mr. Hill, suggesting that he might find a buyer, or had a buyer—I do not know which. I know that Mr. Hill told him that I was out of town and to wait and take it up with me when I got back, which he did. I think that there was a discussion.

"Q. Do you know what it was? A. As I remember—Mr. Medders and I discussed it over hurriedly because I was going out of town again, and we agreed between ourselves —it was not an agreement with Patterson, because I never agreed with Mr. Patterson then, or afterwards, that we would pay $500, which was 5% commission on the price we were going to ask, and I think that it was around $10,000—not exactly $10,000. * * * And I think that either Mr. Patterson called my bookkeeper, or my bookkeeper called Mr. Patterson and Mr. Patterson said that he wanted $750.

"Q. When was this? A. This was along before the sale, and I was getting ready to leave town—I think that Mr. Hill told Mr. Patterson that he would take the matter up with me, then he mentioned it to me and I was leaving, and I think that I referred the matter to Tom Medders, who handled the purchase of the property and also handled the sale.

"Q. You told him to go ahead and handle it with Mr. Patterson? A. Mr. Medders, yes.

"Q. About the 28th of August you called Mr. Patterson in person, did you not, over the telephone and asked him what he was doing about the sale? A. I do not think that I did. I imagine it was Mr. Medders or Hill.

"Q. Did not you in person call him over long distance telephone at Bryson and ask him what he was doing, if he was making any progress? A. I would not say that I did or did not. * * *

"Q. You knew that he had spent a month's time? A. Yes, I did.

"Q. And he reported to your office about it? A. Yes, sir."

On cross-examination this witness was asked:

"Q. Did you talk to him (Patterson) about selling it (the royalty)? A. I talked to him about selling it after I got back.

"Q. What time did you get back? A. About September 6th, probably just before school opened.

"Q. When you came back you found out from your office that Mr. Patterson was working on the sale of the property? A. The bookkeeper informed us, yes. He had called us concerning it.

"Q. That was with your approval? A. We were willing to sell it, yes.

"Q. And willing for George Patterson to sell it? A. Yes, indeed. * * *

"Q. You had several communications between you and George Patterson about the progress that he was making, etc., did not you, after you returned? A. I would not attempt to say how many conversations, I think that I talked to him once, probably. I think that he called up, or I might have been down there (Bryson)—I was there several times.

"Q. At the time the price at which he was trying to sell it was $10,000, was it not? A. I think that at first we asked more money than that, for the royalty.

"Q. But you finally agreed that if he could sell it for $10,000 that you would take $10,-000 for it? A. Yes, sir. * * *

"Q. He told you that he thought that he would be able to consummate a trade within a few days, did not he? A. He told me that when I first talked with him.

"Q. And that was after you came back to the office, it was after you came back, about the 6th? A. Some where along about that time."

There was other testimony of like import on the part of T. B. Medders, the other half owner of the royalty, and Nolen, clerk in the

office, who it appears was in charge during the absence of defendant in California, did not deny that the property had been listed with the plaintiff. It is not to be doubted, we think, that the plaintiffs in error, with full knowledge of defendant's efforts, consented thereto, and they expressed themselves as willing to pay a reasonable compensation if a sale could be effected.

■ In the case of Marr-Piper Co. v. Bullis (Tex. Com. App.) 1 S.W.(2d) 572, it was held that an owner of real estate was liable to a broker for commission, even though the broker had presented the purchaser without any promise or contract with the vendor. This was on the theory of an implied contract, and we think the principle announced in that case applicable here. The defendants certainly knew of Patterson's efforts to sell and certainly consented thereto, and the jury has found upon evidence fully sufficient to sustain the findings that Patterson was the procuring cause of the sale. In view of this state of facts, the conflict between the parties as to whether or not there was a formal "listing" of the property for sale is, we think, immaterial. While ordinarily a listing of the property with a broker is essential to the broker's right of compensation, we do not think it should be said that the plaintiff Patterson, if a procuring cause of the sale, must be denied reasonable compensation for his services, as found by the jury, merely because Joe Mixon, another broker, met E. C. Lawson in Wichita Falls and assisted him in the final sale and transfer of the property. See 7 Texas Jurisprudence, 480, § 83, and authorities cited in note 9, where it is said: "Where the evidence shows that the negotiations immediately leading to the sale were conducted by a broker other than the one who procured the purchaser, the situation is, generally speaking, the same as that which is presented where it appears that the owner directly negotiated a sale with a purchaser found by the broker—that is to say, the plaintiff broker having been instrumental in procuring a purchaser, it does not as a matter of law, destroy his right to commission that the transaction was finally consummated through the efforts of another agent. In case of a dispute between several brokers, he whose efforts are shown to have constituted the procuring cause of the transaction is the one who is entitled to commission."

■ Nor do we think there was any such breaking of Patterson's connection in procuring the purchaser by the telegram withdrawing the royalty from the market as, under the circumstances, is sufficient to deprive Patterson of the recovery awarded him. It is not necessary that we hold that this telegram was sent with a view of defrauding Patterson. A new well had come in close to the property involved and the defendants may, and doubtless did, in good faith, wish to get more for their property, but the fact nevertheless is undisputed that, upon the appearance of Lawson, who had fully determined to buy, the defendants sold upon the precise terms Patterson had submitted to the Lawsons. It does not appear that any additional inducements other than those offered by Patterson brought about the final consummation of the Lawson purchase. So that, as indicated, we think it would be inequitable to deny Patterson reasonable compensation for his long-continued service because of the telegram referred to.

Other assignments relating to charges given and charges refused have been examined, but we find no prejudicial error in these respects and conclude that the judgment below should be affirmed.